RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0121p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

> No. 17-5410

RICHARD E. PAULUS, M.D.,

*Defendant-Appellee*.

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 0:15-cr-0015-1—David L. Bunning, District Judge.

Argued: April 26, 2018

Decided and Filed: June 25, 2018

Before: BATCHELDER, McKEAGUE, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** David M. Lieberman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Robert S. Bennett, HOGAN LOVELLS US LLP, Washington, D.C., for Appellee. **ON BRIEF:** David M. Lieberman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Kate K. Smith, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellant. Robert S. Bennett, Michael P. Kelly, Hilary H. LoCicero, HOGAN LOVELLS US LLP, Washington, D.C., C. David Mussetter, MUSSETTER LAW OFFICE, Catlettsburg, Kentucky, for Appellee. Andrew George, BAKER BOTTS L.L.P., Washington, D.C., Nicholas Bourtin, SULLIVAN & CROMWELL LLP, New York, New York, James F. Segroves, HOOPER, LUNDY & BOOKMAN, PC, Washington, D.C., for Amici Curiae.

---

**OPINION**

---

McKEAGUE, Circuit Judge.   Mark Twain once quipped that "there are three kinds of falsehood: lies, damnable lies, and statistics."   Dr. Paulus begs to differ and insists that certain statistical estimations cannot be false.   As a cardiologist, Paulus interpreted hundreds of angiograms—specialized x-rays that approximate how severely a person's arteries are blocked. A federal jury convicted him of committing healthcare fraud and making false statements, on the theory that he exaggerated the extent of blockages (e.g., noting 80% blockage instead of 30%), so he could perform and bill for unnecessary procedures.   The district court entered a judgment of acquittal and conditionally granted a new trial, reasoning that angiogram interpretations are not facts subject to proof or disproof.   Because angiogram interpretations cannot be false, the reasoning goes, Paulus could not have lied.   We disagree with this premise, and accordingly **REVERSE** the judgment of the district court and **REMAND** for further proceedings.

**I**

Heart diseases are a leading cause of death in the United States.   One major contributor to these ailments is the narrowing of coronary arteries near the heart due to fatty plaque buildup. This case revolves around how doctors measure the severity of that blockage.

**A**

The arteries near a person's heart gradually narrow as a consequence of aging.   An artery becomes narrower as fatty plaque and cholesterol accumulate on the inside of the artery wall. The medical term for this process is "stenosis."   Stenosis itself is neither medically significant nor dangerous—many middle-aged people have some level of stenosis that does not impede the heart's ability to pump blood to the body.   Problems arise when stenosis becomes more severe. If the artery becomes too narrow, it tends to restrict the amount of blood flowing back into the heart.   This can trigger chest pain or pressure, which in turn should prompt a visit to the doctor. If ignored or left untreated, the plaque buildups can rupture and form a clot that completely

blocks blood flow into the heart.  The patient then experiences a heart attack, which can quickly be fatal.

No one wants to risk a heart attack.  But diagnosing the source of chest pain is complicated and difficult, even for seasoned doctors.  There are plenty of other cardiac (and non-cardiac) conditions that can mimic the symptoms of severe stenosis.  To promote accurate diagnosis and effective treatment, the medical field has developed a battery of tests, each with their own advantages and disadvantages.  These include noninvasive Electrocardiograms (EKGs) and Echocardiograms (ECHOs), which use electrical signals and ultrasound waves to measure the heart's integrity.  Invasive tests, such as Nuclear Stress Tests (NSTs), require injecting radioactive dye into the bloodstream and then using imaging software to observe blood flow through the cardiac system.

When these tests indicate that the pain is coming from the heart, additional tests can be done to determine whether stenosis is the culprit.  One of those tests is an invasive procedure called cardiac catheterization, which produces images known as angiograms.  A doctor obtains an angiogram by threading a catheter up through a person's blood vessels and injecting contrast dye into the arteries near the heart.  The doctor then takes an x-ray of the area, which permits a cardiologist to estimate how severe the blockage is.  Catheterization is riskier than performing EKGs, ECHOs, or NSTs, due to the insertion of a foreign object (the catheter) into a blood vessel.

If the angiogram shows at least 70% blockage, the accepted standard of medical care allows a doctor to insert a stent with no further testing.  A stent is a small mesh cylinder that props the artery open to increase blood flow.  Stents can improve blood flow and help prevent heart attacks, but they cannot cure stenosis or prevent its progression.  Moreover, stents are permanent, and the procedure has been known to cause dangerous bleeding or blood clots in some cases. But when a patient's blood vessels are narrowed by 70% or more, the risk of a heart attack or stroke caused by the stenosis is more severe than any risks posed by the stenting procedure.

Cardiologists also consider a blockage between 50% and 70% to be troubling. However, because angiograms are sometimes inconclusive in this range, the medical consensus appears to be that a stent is justified at these levels only if other testing (such as an intra-vascular ultrasound, or IVUS) confirms that the stenosis is dangerous to the patient. If the blockage is less than 50%, then the problem does not typically justify the risks involved in placing a stent.

Part of the difficulty with angiograms is that they can be interpreted differently by different cardiologists. At trial, the government's experts acknowledged that the "inter-observer variability" between two cardiologists would generally be between 10% and 20%, meaning that one doctor might record 60% stenosis while the other observed 80% stenosis. Apparently, the variances are most pronounced in the "intermediate" stenosis range (between 50 and 70 percent). However, the government's experts reiterated that a cardiologist should rarely commit a larger error, such as recording a 40% blockage as a 70% blockage, due to the qualitative medical difference between mild, intermediate, and severe blockage.

This relative confidence in angiogram interpretation has not gone unchallenged. Paulus and one of the *amici* in this case cite several studies where inter-observer variability was much larger. *See* Leonard M. Zir, et al., *Interobserver Variability in Coronary Angiography*, 53 CIRCULATION 627, 627–29 (1976) (40 angiograms) (reporting 24 instances with inter-observer variability of 40% or greater and 10 instances where variability exceeded 90%); Miguel E. Sanmarco, et al., *Reproducibility of a Consensus Panel in the Interpretation of Coronary Angiograms*, 96 AM. HEART J. 430, 430–32 (1978) (14 angiograms) (reporting that, out of fourteen four-doctor panels who viewed the same angiogram seven months apart, six of them varied between 75% and 100% between the first and the second reading); Ernest N. Arnett, et al., *Coronary Artery Narrowing in Coronary Heart Disease*, 91 ANNALS OF INTERNAL MEDICINE 350, 354 (1984) (reporting variability of 40% and higher); Lucian L. Leape, et al., *Effect of Variability in the Interpretation of Coronary Angiograms*, 139 AM. HEART J., 106, 111 (2000) (reporting some instances where cardiologists disagreed by between 39% and 100% on the blockage shown by an angiogram).

Paulus contends that these studies show that he could not have made a false statement when interpreting the relevant angiograms.

**B**

Dr. Paulus was a well-known cardiologist at King's Daughters Medical Center (KDMC) in Ashland, Kentucky. During his practice, he routinely billed both private and public insurers for his services.

There is no dispute that Dr. Paulus was a workhorse. On a normal day, he would usually perform more angiograms than his colleagues would on their busiest day. This "astronomical" amount of work made Paulus first in the nation for the total amount billed to Medicare for these procedures. Paulus was rewarded for his efforts: His annual salary clocked in at around $2.5 million, well above the cutoff for the top quarter of cardiologists, who are paid around $665,000 annually. This salary was driven, in part, by KDMC's per-procedure compensation package, which rewarded Paulus according to the number of procedures he performed.

Paulus's productivity did not go unnoticed. In 2008, the U.S. Department of Health and Human Services received an anonymous complaint that Paulus was defrauding Medicare and Medicaid by performing medically unnecessary procedures. *See* 42 U.S.C. §§ 1320c-5(a)(1), 1395y(a)(1). Specifically, the complaint alleged that Paulus would place stents into arteries that were not blocked, with the approval and encouragement of KDMC. The agency referred the matter to one of its anti-fraud contractors, which noticed Paulus's abnormally high billing volume and selected nineteen of his angiograms for a medical audit. The cardiologist who performed the audit concluded that in seven of these cases, the blockage was insufficient to warrant a stent. Based on these results, Medicare denied reimbursement for those procedures and continued investigating Paulus.

Subsequently, Anthem Blue Cross, a private insurer, did its own review of Paulus's angiograms. Out of eleven randomly selected angiograms, Anthem's auditor concluded that at least half the stents ordered by Paulus were not medically necessary. Specifically, the auditor noted that although Paulus reported stenosis of 70% or greater, the angiograms showed only 50% stenosis—and sometimes far less than that. These blockages were, in the opinion of Anthem's cardiologist, "not clinically relevant."

In 2012, a neurologist at KDMC sent an anonymous letter to the Kentucky Board of Medical Licensure (KBML) making similar accusations. The Board responded by investigating and subpoenaing records from KDMC, including fifteen angiograms. These records were provided to a cardiologist at the University of Kentucky for a similar medical audit. He, too, concluded that Paulus had diagnosed these patients with severe stenosis where none was apparent from the angiograms. Paulus denied these accusations, but since he had retired, he voluntarily surrendered his medical license to end the inquiry.

**C**

Eventually, these allegations made their way to a federal grand jury. Paulus was subsequently indicted for committing healthcare fraud and making false statements to healthcare benefit programs. Paulus moved to dismiss the indictment, claiming that it failed to state an offense. The district court denied the motion, rejecting Paulus's argument that (as a matter of law) angiogram interpretations could not be true or false. Later, Paulus filed several *Daubert* motions, claiming that the angiogram images used by the government's experts were of lesser quality than the ones he viewed, and in any event, that the government's experts did not clear *Daubert*'s reliability hurdles. The court also denied this motion, holding that the images were acceptable copies under Rule 1003 and finding that the opinions were at least minimally reliable under *Daubert*. It noted, however, that Paulus could attack the credibility of the opinions before the jury.

Paulus's trial lasted for twenty-seven days—twenty-three days of trial and four days of deliberations. The jury convicted Paulus on ten false-statement counts and on the healthcare fraud count. It acquitted him on five false-statement counts.

The government's case rested primarily on the testimony of nine doctors. Three of them were called with the express purpose of offering expert testimony. Dr. Ragosta was apparently retained for the trial. However, Dr. Morrison was the auditor for Anthem; Dr. Moliterno was the auditor for the Kentucky Medical Board. The other six doctors were cardiologists who either worked with Paulus in the past or had treated his patients. These six doctors testified both about

matters of fact and offered some limited medical opinions.  Their conclusions are summarized in the table below:

| Witness (sample size) | Trial Opinion Covered: | Paulus's Conclusions | Witness Conclusions |
|---|---|---|---|
| Ragosta (250-300 procedures) | 62 angiograms | 70% or more blockage | No more than 40% blockage; patients did not need stents |
| Morrison (11 files from Anthem) | 4 angiograms | 70% or more blockage | Three patients with less than 50% stenosis; the fourth had no blockage |
| Moliterno (15 angiograms subpoenaed by KBML | 6 angiograms | 70% or more blockage in each instance | All patients had less than 50% blockage; considered "trivial" or "mild" stenosis |
| Touchon (20-30 former Paulus patients) | 5-10 angiograms | Blockage warranted a stent | All patients had less than 50% blockage |
| Studeny (20-50 former Paulus patients) | 20 angiograms | Blockage warranted a stent | None of the patients' blockages warranted a stent |
| Shah (former Paulus colleague) (less than 10 patients) | Witnessed "several" angiograms | Blockage warranted a stent | No severe blockage in the arteries; patients did not need stents |
| Kelleman (former colleague) | Treated several patients while Paulus was unavailable | Blockage warranted a stent | Arteries did not have any significant stenosis |
| Ali (reviewed "a few" angiograms) | 3 angiograms | 70% or more blockage in each instance | Arteries lacked significant stenosis, 70% was "highly inappropriate" |
| Elesber (reviewed a "substantial number" of angiograms) | "substantial number" | Blockage warranted a stent | Patients had 10-20% stenosis and did not need a stent |

The government called other witnesses to reinforce the inference drawn by these doctors—namely, that Paulus systematically exaggerated the amount of blockage he saw on the angiograms.  This testimony included several former patients and an analysis of Paulus's financial records.  The district court set aside the ensuing guilty verdicts and entered a judgment of acquittal on the grounds that the government had not proven fraudulent intent or a false statement.  It also conditionally granted Paulus's motion for a new trial.  The government appeals both orders.  We have jurisdiction under 28 U.S.C. §§ 1291 and 3731.

**II**

There are two issues presented by this appeal. First, the government contends that the district court erred in granting a post-verdict judgment of acquittal. Second, the government argues that the order granting a new trial must be set aside because it is based on the same erroneous reasons supporting the judgment of acquittal. We agree with the government on all counts. We therefore reverse the judgment of acquittal, vacate the order granting a new trial, and remand for further proceedings not inconsistent with this opinion.

**A**

A district court may enter a judgment of acquittal if the government's proofs are legally insufficient to sustain a conviction. Fed. R. Crim. P. 29. In resolving this question, the court must view the evidence "in the light most favorable to the prosecution," and may not enter a judgment of acquittal if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017) (emphasis in original). Therefore, courts may not "independently weigh[] the evidence, nor judge[] the credibility of witnesses." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999). This rule applies with equal force to the testimony and conclusions of the government's expert witnesses. *Persaud*, 866 F.3d at 383. We exercise de novo review over these questions—like the district court, we only ask whether a rational trier of fact could return a guilty verdict. *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011). If so, the verdict must stand.

The district court held that the government failed to prove falsity and fraudulent intent, both of which are essential elements of the crimes charged. *See* 18 U.S.C. §§ 1035(a)(2), 1347. It reasoned that that the "degree of stenosis" (i.e., artery blockage as measured by an angiogram) "is a *subjective medical opinion*, incapable of confirmation or contradiction." It based this ruling on "evidence presented at trial" showing that "interpreting angiograms is a difficult task" and that "cardiologists frequently disagree with one another regarding the degree of stenosis." Since Paulus's interpretations of his angiograms could not be "subject to proof or disproof," the district court concluded that they could be neither false nor fraudulent.

We resolved this exact issue less than a year ago, albeit after the district court here had issued its decision. *Persaud*, 866 F.3d at 383. We believe we were clear then, but we make it explicit now: The degree of stenosis *is* a fact capable of proof or disproof. A doctor who deliberately inflates the blockage he sees on an angiogram has told a lie; if he does so to bill a more expensive procedure, then he has also committed fraud. Even state-of-the-art scientific measurements may sometimes be imprecise. But in these circumstances, it is up to the jury—not the court—to decide whether the government's proof is worthy of belief. *See Persaud*, 866 F.3d at 383; *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993). For this reason, the jury's verdict must be reinstated.

Although *Persaud* controls the outcome here, we pause to make sure the standard is clear. The false-statement and fraud statutes require proof, beyond a reasonable doubt, that the defendant made a statement "capable of confirmation or contradiction." *United States v. Kurlemann*, 736 F.3d 439, 445 (6th Cir. 2013). When the government "demonstrates that the asserted proposition is untrue," it has shown that the defendant made a false statement and has proven one element of the offense. *United States v. Waechter*, 771 F.2d 974, 978 (6th Cir. 1985) (interpreting 18 U.S.C. § 1010). Ordinarily, facts are the only item that fits in this category; opinions—when given honestly—are almost never false. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS §§ 538A, 539; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974) ("[T]here is no such thing as a false idea.").

But opinions are not, and have never been, completely insulated from scrutiny. At the very least, opinions may trigger liability for fraud when they are not honestly held by their maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion. RESTATEMENT (SECOND) OF TORTS § 539(1)(a); *see also United States v. AseraCare, Inc.*, 176 F. Supp. 3d 1282 (N.D. Ala. 2016) (holding that certain good-faith medical diagnoses by a doctor cannot be false). Thus, although it takes the form of a pure opinion, "a statement that a bond is a good investment, even though made by a person attempting to sell it, is a fraudulent misstatement . . . if the vendor knows that the interest on the bond has for years been in default and the corporation that issued it is now in the hands of a receiver." RESTATEMENT (SECOND) OF

TORTS § 539, cmt. *a*. So too, when the maker of an opinion does not believe what he or she is saying—in such a case, the speaker has falsely represented their own state of mind.

**B**

For this reason, we think it is clear that Paulus was convicted for misrepresenting facts, not giving opinions. Paulus was charged with lying about the results of the angiograms he conducted and using those lies to bill the taxpayers for unnecessary stenting procedures. Angiograms exist to measure the blockage of coronary arteries. Excessive blockage of coronary arteries routinely leads to serious heart problems and can ultimately trigger a heart attack. *Persaud*, 866 F.3d at 374–75; R. 203, Dr. Ragosta Testimony, PID 4963–64. The blockage cannot be witnessed by the naked eye, but we have no doubt that a coronary artery blockage "actually exists" as "an aspect of reality." *Fact*, BLACK'S LAW DICTIONARY (10th ed. 2014); *Persaud*, 866 F.3d at 374–75; R. 203, Dr. Ragosta Testimony, PID 4955–67; *Heart Disease Facts*, CTRS. FOR DISEASE CONTROL & PREVENTION, www.cdc.gov/heartdisease/facts.htm; *Coronary Artery Disease*, MAYO CLINIC, www.mayoclinic.org/diseases-conditions/coronary-artery-disease/symptoms-causes/syc-20350613. Indeed, it would be an insult to common sense and the practice of medicine to say that Paulus was not measuring facts (or attempting to do so) when he conducted the angiograms at issue here.

In other words, though we would never fault a doctor for simply misreading an angiogram, that is not the government's case here. Rather, the government claims that Paulus repeatedly and systematically saw one thing on the angiogram and consciously wrote down another, and then used that misinformation to perform and bill unnecessary procedures. The difficulty of interpreting angiograms has no bearing on the capacity of these statements to be false.

The difficulty is, instead, that the government might have a hard time proving that Paulus saw one thing but willfully recorded another. We have no reason to disbelieve the arguments made by Paulus and amici that different doctors can interpret the same angiogram differently—sometimes much, much differently. Words can prove similarly confounding. *See, e.g.*, *Muscarello v. United States*, 524 U.S. 125 (1998); *Heimer v. Companion Life Ins. Co.*, 879 F.3d 172 (6th Cir. 2018); *United States v. Marshall*, 908 F.2d 1312 (7th Cir. 1990). It would not be unreasonable if, faced

with the evidence now cited to us, a jury concluded that Paulus was acting in good faith and that the government's experts were "unfairly second-guessing his reasonable decisions" and making incorrect assumptions about the medical science. *Persaud*, 866 F.3d at 384. Indeed, Paulus's counsel made a similar case to the jury, in the hopes that it would acquit his client.

But we are not the jury. And the jury, in this case, came to the opposite conclusion. *Persaud* makes it clear that Paulus cannot win a post-verdict motion for a judgment of acquittal simply by "dismantling the methodology of the government's expert witnesses." *Id.* at 381.[1] However difficult it might be for a cardiology expert to prove that his colleague was lying about what he saw on a scan, and however imprecise the science might be, "[T]he reliability and believability of expert testimony, once that testimony has been properly admitted, is exclusively for the jury to decide." *Id.* at 380–81. As in *Persaud*, so too with Paulus: "It cannot be the case that a juror acts irrationally as a matter of law when he credits the testimony of one expert witness over another." *Id.* at 381.

Here, the government presented a phalanx of experts who testified that Paulus systematically recorded severe blockages even when the angiograms only showed mild blockages or no blockage at all. *See* R. 203, Dr. Ragosta Testimony, PID 5001–116 (reviewing 62 patients where Paulus had recorded 70% stenosis or higher, and concluding that the actual level of stenosis was 40% or lower); R. 212, Dr. Morrison Testimony, PID 5705–19 (discussing four patients where Paulus had recorded 70% stenosis or higher, and concluding that the actual level of stenosis was 50% or lower for three of them and that the fourth had no blockages); R. 223, Dr. Moliterno Testimony, PID 6663–708 (same, except all six patients reviewed had 50% stenosis or lower).

These opinions, having been accepted into evidence, are sufficient to carry the government's burden of proof. They assert that Paulus routinely exaggerated what he saw on his patients' angiograms, and therefore that his statements were false. That is all the statutes require

---

[1]An exception to this rule might be in the rare case where the scientific literature proved that an expert's opinion was so fundamentally unsound under *Daubert* that admitting it would have been an abuse of discretion. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 667–78 (6th Cir. 2010). In those cases, it would probably also be true that no reasonable jury would have credited the evidence. *See id.* But that is not true in a case like this, where a medical opinion occupies the daylight between "absolute certainty" and a mere "hunch." *Id.*

from the government. If one juror had a reasonable doubt about the persuasiveness of the government's experts, he or she could have prevented the jury from returning a guilty verdict. *See Richardson v. United States*, 526 U.S. 813, 817 (1999). But the court may not enter a judgment of acquittal merely because it doubts the persuasiveness of the government's expert testimony. We therefore uphold the jury's finding that Paulus made a false statement.

## C

The district court also found that the government failed to prove fraudulent intent. Although they are legally separate inquiries, the district court's intent analysis leaned heavily on its erroneous finding that angiogram readings cannot be false. This overlapping analysis was not itself erroneous, but the district court's flawed premise led it to the incorrect outcome once again.

To convict Paulus, the government had to show that his false statements were willful and that he acted with intent to defraud. 18 U.S.C. §§ 1035, 1347; *Persaud*, 866 F.3d at 308, 384. The government need not offer direct evidence; instead, "a jury may consider circumstantial evidence and infer intent from evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *Persaud*, 866 F.3d at 380. As the district court noted, a doctor may not be convicted of fraud for mere mistaken judgments or good-faith efforts to treat patients to the best of his ability. *See id.* When deciding a motion for a judgment of acquittal, however, the court can only ask whether the government presented evidence allowing a reasonable jury to find that Paulus lied about what he saw on the angiograms with the intent to deceive the government. *Id.* at 379–80.

The government has carried its burden here. At trial, the government presented evidence of Paulus's "astronomical" billing numbers, his enormous salary, injured patients' testimony, and other evidence about KDMC's behavior that supported an inference that something was amiss. The prosecutors then showed the jury around 100 angiograms and offered expert testimony explaining that Paulus had recorded severe blockages where none existed. At the end of the government's case, a reasonable jury could be left with the impression that the problems in this case came from a lengthy pattern of fraudulent over-diagnosing by Paulus. Although Paulus engaged in less egregious conduct than the doctor in *Persaud*, we never indicated that a lesser

quantum of evidence would have resulted in a judgment of acquittal in that case. *Id.* at 374–77. We therefore uphold the jury's finding that Paulus acted willfully and with fraudulent intent.

In sum, Paulus's arguments come too little and too late. The place to challenge unreliable expert testimony is in a *Daubert* motion or through impeachment at trial. Paulus tried both strategies; he lost both times. Rule 29 does not give him a third bite at the apple. Accordingly, we vacate the judgment of acquittal and reinstate the jury's guilty verdict.

## III

The district court also conditionally granted Paulus's motion for a new trial. When a court grants a judgment of acquittal, it must also "conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1). In doing so, it "must specify the reasons" for granting or denying the new trial. *Id.* A district court's decision on a motion for a new trial is reviewed for an abuse of discretion. *See United States v. LaVictor*, 848 F.3d 428, 455 (6th Cir. 2017).

## A

Paulus's motion was based on a litany of alleged legal errors and on the weight of the evidence. The district court rejected all but three of those arguments. And the three arguments the district court accepted all went to the weight of the evidence. First, the district court credited Paulus's argument that the KBML settlement, his salary, and the overall number of procedures were not probative of his fraudulent intent. Second, the district court agreed with Paulus's argument that the evidence failed to prove he made a false statement. And third, the district court found persuasive Paulus's argument that the evidence failed to prove he acted with fraudulent intent.

But the district court's analysis of Paulus's winning arguments left much to be desired. In deciding the new-trial motion, the district court had to take on a different role than when reviewing the acquittal motion: the district court had to act as the "thirteenth juror" to "consider the credibility of witnesses and the weight of the evidence" to ensure there had not been a miscarriage of justice. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). Although the

district court mentioned that role in passing, no detailed credibility findings or weighing of evidence ever came.  Instead, the district court simply provided these conclusory statements:

> The Court thoroughly considered all of this evidence in the acquittal section [of the order] and found it to be insubstantial circumstantial evidence. Accordingly, no further discussion is warranted.

> Under the acquittal standard, the Court places its thumb on the scale in favor of the Government. When the Court removes its thumb from the scale and considers the evidence as the thirteenth juror, without drawing all reasonable inferences in favor of the Government, the Court must also conclude that the jury's verdict was against the manifest weight of the evidence.

This does not satisfy Rule 29(d)(1)'s requirement that the court explain why the verdict was against the weight of the evidence.  This requirement exists for a reason: without an actual explanation, we cannot determine whether the district court abused its discretion.  An abuse of discretion occurs when a district court (1) relies on clearly erroneous factual findings, (2) improperly applies the law, or (3) uses an erroneous legal standard.  *See United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010).  Here, if the district court conditionally granted a new trial for the same reasons—and only the same reasons—that it granted a judgment of acquittal, then it abused its discretion.  As explained above, the district court improperly applied the law when ruling that angiogram interpretations cannot be false and that things such as an abnormally high salary or procedure rate cannot be probative of fraudulent intent.  But if the district court simply "disagree[d] with the jury's resolution of conflicting evidence," *Lutz*, 154 F.3d at 589, we might not find an abuse of discretion.  Instead, we would have to examine the record to determine whether the district court relied on clearly erroneous factual findings.

We therefore vacate the order granting a new trial and remand so the district court can reconsider its ruling in light of Part II of this opinion.  If, after giving due respect to the weight of a jury verdict in our criminal-justice system, the district court still finds that the verdict was against the manifest weight of the evidence and resulted in a miscarriage of justice, then it should provide a detailed analysis explaining why.

**B**

Paulus asks us to affirm on other grounds, arguing that two legal errors also justified a new trial.  First, he claims that the "altered" angiograms should not have been admitted into evidence.  Second, he argues that Paulus's settlement with the KBML was admitted in violation of Rule 408 of the Federal Rules of Evidence.  We review all such evidentiary rulings for an abuse of discretion, and we find none here.  *United States v. Lattner*, 385 F.3d 947, 958 (6th Cir. 2004).

First, the archived angiograms.  Paulus asserts that the images presented to the jury were not strictly the same as the ones he actually viewed.  This is only half true, and is wholly irrelevant.  The Rules of Evidence do require that the proponent of an image "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  But the government did that here.  It elicited testimony from at least three doctors that such "archived" images were the same as the ones Paulus viewed in the lab, just at a lower resolution.  These same doctors also testified that the images were "good enough . . . for clinical judgment," and were "of diagnostic quality."  Thus, the government carried its initial burden of showing that the angiogram images are "what the proponent claims."  Fed. R. Evid. 901(a).

Paulus's only avenue of victory is to create a "genuine question" about the accuracy of the archival images under Rule 1003.  R. 155, Mem. & Order, PID 3398 (admitting the angiograms as accurate "duplicates").  His brief makes no attempt at accomplishing this.  Instead, he fixates on the government's initial burden of authentication under Rule 901, and he does not cite or analyze any authority showing that the duplicates were inaccurate.  Thus, to the extent Paulus seeks relief through this argument, it is forfeited.  *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 350 F.3d 972, 979 (2000).

Next, the KBML order.  Paulus claims that, despite its "little evidentiary value," the government improperly relied on the order at trial to prove his intent.  To start with, Paulus has forfeited any argument that the settlement violated any rule, much less Rule 408, because he did not object to its admission (or the government's reference to it) on this basis during trial.

We therefore review the admission of the order only for plain and prejudicial error, on top of the generous abuse-of-discretion standard. *United States v. Pierce*, 62 F.3d 818, 831 (6th Cir. 1995).

There was no plain error in admitting the order. Rule 408 expressly allows the introduction of "conduct or a statement made during compromise negotiations" if they are "offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority." Fed. R. Evid. 408(a)(2); *United States v. Davis*, 596 F.3d 852, 860 (D.C. Cir. 2010); *United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir. 1994). This is exactly what the government did—it introduced statements, made by Paulus, as part of a stipulated agreement with the KBML over his medical license. At least on its face, Rule 408 contemplates that this evidence would be admissible in a criminal prosecution.

Paulus also identifies several advisory comments to the rule that ostensibly require exclusion. *See* Fed. R. Evid. 408, Advisory Comm. n. to 2006 Amendments ("An offer or acceptance of a compromise of any civil claim is excluded under the Rule if offered against the defendant as an admission of fault . . . . Unlike a direct statement of fault, an offer or acceptance of a compromise is not very probative of the defendant's guilt."). But he overlooks the fact that the same notes also point out that "statements and conduct" that amount to an admission of fault *are* admissible under the rule. *Id.* As the government argues, the agreement contains a concession by Paulus that the KBML "could conclude that he has engaged in conduct" which violates the law. It also cites specific findings by KBML about Paulus's conduct and the agency's belief that Paulus had violated the rules governing the practice of medicine. Although the government's references to the agreement might walk the fine line between an "acceptance" of a compromise and an admission of liability, we cannot say that the district court plainly abused its discretion in admitting the evidence here.

**IV**

The government produced sufficient evidence to support the guilty verdict. We therefore **REVERSE** the judgment of acquittal and **REINSTATE** the jury's verdict. Furthermore, we **VACATE** the conditional order granting a new trial and **REMAND** for reconsideration of Paulus's weight-of-the-evidence arguments.