UNITED STATES of America, Appellee,

v.

Gerald L. MINSKY, Appellant.

No. 91–5861.

United States Court of Appeals, Sixth Circuit.

Argued April 2, 1992.

Decided May 7, 1992.

Rehearing Denied Aug. 20, 1992.

---

Seymour Glanzer (argued), Washington, D.C.; Patrick H. Molloy, and Alagia, Day, Marshall, Mintmire & Chauvin, Louisville, Ky.; and Marvin B. Segal, New York City (briefed), for appellant.

Michael R. Baer, Asst. U.S. Atty. (argued), and Karen Caldwell, U.S. Atty. (briefed), Lextington, Ky., for appellee.

Before: KEITH, Circuit Judge, and LIVELY and TIMBERS,* Senior Circuit Judges.

TIMBERS, Senior Circuit Judge.

Appellant Gerald L. Minsky appeals from a judgment entered April 23, 1991 in the Eastern District of Kentucky upon a jury verdict of guilty on charges of mail and wire fraud and conspiracy stemming from the killing of a thoroughbred horse for an insurance payout, in violation of 18 U.S.C. §§ 1341, 1343 and 371 (1988).

Minsky contends on appeal that various constitutional and statutory errors at trial were prejudicial in impairing his ability to impeach an important government witness. His primary contentions are: (1) that the court's holding an *ex parte* bench conference during trial without defense counsel being present violated his due process rights and his right to counsel; (2) that the government's refusal to disclose information contained in certain FBI reports violated *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) that the court's refusal to order production of prior recordings of two witness' statements violated the Jencks Act, 18 U.S.C. § 3500 (1988). We shall consider each of these contentions *seriatim*.

For the reasons that follow, we reverse appellant's conviction and remand the case for a new trial.

## I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

---

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

On November 7, 1990, Minsky was indicted on three counts of mail and wire fraud and conspiracy arising from the killing of a thoroughbred horse in order to collect insurance proceeds. The indictment charged that in November 1987 Minsky conspired with Dr. Joseph Brown, a Kentucky dentist, and Robert West, a Kentucky bloodstock agent, to inject a lethal dose of insulin in McBlush, a racehorse owned by Minsky and insured for $20,000 by Lloyd's of London.

The prosecution's case against Minsky was based on the testimony of Brown and West. They agreed to testify against Minsky pursuant to a plea agreement stemming from charges that they had killed a Florida racehorse in an unrelated incident in February 1990. In exchange for their cooperation, all 1990 Florida charges against Brown and West were dropped. They plead guilty to a single conspiracy count charging the killing of McBlush. The government also agreed to move at sentencing for a downward departure under the Sentencing Guidelines to reflect their cooperation.

At trial, Brown testified that in 1985 he purchased a mare named Fran Nasra for $100,000 cash, plus a $100,000 promissory note. Six months after the sale, the $100,-000 promissory note, which was secured by a lien on Fran Nasra and her offspring, was assigned to Minsky. Although Brown made some principal payments, by 1987 he still owed Minsky $50,000, plus accrued interest. He testified that Minsky continually pressured him for payment, but without success.

Minsky suggested to Brown, in an October 1987 phone conversation, that the debt would be forgiven if Brown agreed to kill McBlush. West, who had been terminated as one of Minsky's employees, testified that Minsky called him—not Brown—in September 1987 and asked West to kill McBlush. West also testified that several days later the three men engaged in a conference call during which they discussed applying the proceeds of the insurance on McBlush to reduce Brown's outstanding debt to Minsky. Brown did not refer to this call in his testimony. No telephone records were produced to confirm that this call took place. Minsky's former secretary, Diane Donase, testified that she overheard the September conference call; at sentencing, the trial judge remarked that her testimony was "too fantastic to be true," and he questioned her motives. Brown testified that after several failed attempts they killed McBlush on November 4, 1987 by injecting the horse with insulin.

On the second day of the six day trial, at the conclusion of Brown's direct testimony, Minsky moved pursuant to the Jencks Act for production of, among other things, all prior statements made by Brown and West. Minsky claims that the Jencks Act material included statements made by Brown and West to FBI agents on routine investigation forms ("FBI 302s"). The prosecution objected, arguing that neither Brown nor West had adopted or affirmed the statements in those reports after they were recorded by the investigating FBI agents, and that the reports were not used to refresh Brown's recollection prior to his testimony.

In response to the prosecution's objections, the court held an *in camera* review of the FBI 302s. Brown's two FBI 302s, which the court found to be "substantially identical" to his direct testimony, did contain a statement regarding a conversation between Brown and Jerry Healy, a friend of Minsky. During this conversation, Brown told Healy about injecting McBlush with insulin. Brown asked Healy to tell Minsky to "lay off" efforts to collect the outstanding debt, saying that it was his understanding that killing McBlush absolved him of any debt to Minsky. When the government questioned Healy prior to trial, Healy stated that he had no recollection of any discussion with Brown about the killing of McBlush. Healy's statement, if made known at trial, might have undermined Brown's credibility.

After a brief recess, during which the court considered Minsky's *Brady* and Jencks Act requests, the court held a side-

bar conference with *only* the prosecutors present, stating that:

"The Court has reviewed the 302 materials. I have reread Presser and Nathan, and before I make my ruling, however, there is one matter I need to clear up with counsel for the United States. And this will be part of my *in camera* review of the materials submitted by the United States and I will ask that counsel for the United States approach the bench."

The court asked the prosecutors whether the defense had been made aware of the existence of Healy as a potential witness, or of the conversation itself, pursuant to its obligations under the Jencks Act and *Brady*. The prosecution responded that a polygraph test had been administered to Brown, the results of which had been given to the defense. As part of the test, Brown was questioned about his conversation with Healy. Although the test questions did not elaborate on the substance of that conversation, the test results suggested that Brown had lied. The prosecutors stated that the test results were inadmissible at trial. They nevertheless argued that, by receiving the test questions and results, the defense was adequately apprised of the existence of both Healy and his conversation with Brown. Any failure to pursue this line of defense, according to the prosecutors, was the fault of defense counsel.

Following the bench conference, the judge ordered the prosecution to recall Brown and to make clear (1) that he received no insurance proceeds for the killing of McBlush; (2) that Brown's understanding of the deal was that killing McBlush absolved him of any outstanding debt to Minsky; and (3) that after the killing, when Minsky renewed efforts to collect the debt, Brown contacted Healy. This order of the court sought to ensure that the defense was apprised adequately of any conversation between Healy and Brown, in satisfaction of both the Jencks Act and *Brady*.

On cross-examination, Minsky's counsel sought to undermine Brown's testimony by establishing that his incriminating testimony was given under the belief that the *prosecution* would treat him favorably by asking the court at the time of sentencing for a downward departure under the Guidelines. In response to counsel's questions, Brown responded that he was "pretty well locked with whatever the guidelines show" and therefore he did not anticipate any substantial reduction in sentence as a result of his cooperation. The court interrupted this colloquy by asking the prosecutors whether the case was governed by the Guidelines. When the prosecutors erroneously responded that the case was *not* under the Guidelines, the court instructed defense counsel to ask Brown whether he anticipated favorable treatment from the sentencing *judge*, to which Brown responded that he did not.

The government's entire case rested on the testimony of Brown and West. The government failed to produce any medical experts to confirm that McBlush had died from insulin; rather, medical experts testified that the cause of death seemed to be colic, an inflammation of the intestinal track unrelated to insulin which frequently caused death in horses. Minsky asserts that the government failed to establish any motive; no explanation was given why Minsky was willing to forgive a $50,000 debt upon the death of a horse insured for $20,000.

Despite these inconsistencies, Minsky was convicted. He was sentenced to 18 months incarceration, a $100,000 fine, $82,000 in restitution, $150 in special assessments, and 2 years supervised release. After entering guilty pleas, Brown and West each were sentenced to 5 year terms of probation, including a 6 month period of residency in a half-way house; and each ordered to pay $9,500 in restitution and $50 in special assessments. The absence of incarceration for Brown and West was the result of the prosecution's motion for a downward departure based on cooperation. Minsky now appeals his conviction.

## II.

With this summary of the facts and prior proceedings in mind, we turn first to the claim that the *ex parte* bench confer-

ence regarding the FBI 302s is ground for reversal. We hold that it is.

The court stated that the *ex parte* bench conference was part of its *in camera* review of the FBI 302s for the express purpose of ruling on the defense motions under both the Jencks Act and *Brady.* We acknowledge that an *in camera* review by the court was not only proper, but probably required. *See, e.g., United States v. Rewald,* 889 F.2d 836, 867–69 (9th Cir.1989), *cert. denied,* 111 S.Ct. 64 (1990) (remand for further findings required in view of absence of *in camera* review). This review in this case, however, should have been performed early in the proceedings, not at the eleventh hour. An *in camera* review is not an open justification for an *ex parte* bench conference.

The constitution requires that a defendant be represented at every critical stage of his trial. *E.g., United States v. Cronic,* 466 U.S. 648, 659 n. 25 (1984) (footnote omitted) ("The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."); *Haller v. Robbins,* 409 F.2d 857, 859 (1st Cir.1969) ("[I]t is improper for the prosecutor to convey information or to discuss any matter relating to the merits of the case or sentence with the judge in the absence of counsel.").

*Ex parte* proceedings "can only be justified and allowed by compelling state interests." *In re Taylor,* 567 F.2d 1183, 1188 (2d Cir.1977). "[N]ot only is it a gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure." *Haller, supra,* 409 F.2d at 859; *United States v. Earley,* 746 F.2d 412, 416 (8th Cir.1984), *cert. denied,* 472 U.S. 1010 (1985) (prior citation omitted) (footnote omitted) ("An *ex parte* communication between a trial court and government counsel '[i]n addition to raising questions of due process ... involve[s] a breach of legal and judicial ethics. Regardless of the propriety of the court's motives in such a case ... the practice should be discour-

aged since it undermines confidence in the impartiality of the court.' "); *In re Taylor, supra,* 567 F.2d at 1188 (quoting *Carroll v. Princess Anne,* 393 U.S. 175, 183 (1968)) ("The value of a judicial proceeding, as against self-help by the police, is substantially diluted where the process is *ex parte* because the court does not have available the fundamental instrument of judicial judgment: an adversary proceeding in which both parties may participate.").

Although there are circumstances where an *ex parte* communication might be "overlooked," "the burden of proving lack of prejudice is on the [government], and it is a heavy one." *Haller, supra,* 409 F.2d at 860; *United States v. Hackett,* 638 F.2d 1179, 1188 (9th Cir.1980), *cert. denied,* 450 U.S. 1001 (1981). The *ex parte* conference in the instant case occurred at a time when the defense was arguing that the FBI 302s were subject to disclosure under the Jencks Act and *Brady.* The release of this material would have allowed the defense to undermine the credibility of Brown, a key government witness. The government has proffered no explanation why the defense was denied an opportunity to participate in a conference at such a critical stage of the proceedings. We refuse to condone conduct that "undermines confidence in the impartiality of the court." *Earley, supra,* 746 F.2d at 416.

We hold that the *ex parte* sidebar conference violated Minsky's right to a fair trial and was a Sixth Amendment violation. Although this violation is sufficient alone to require the granting of a new trial, in view of the related *Brady* and Jencks Act claims, we shall address them as well.

### III.

■ We turn next to the claim that the government's refusal to disclose the information in the FBI 302s violated *Brady v. Maryland,* 373 U.S. 83 (1963).

We hold that it did. Although *Brady* never has been read to create a constitutional right in the accused to unlimited discovery, it nevertheless imposes on the government a duty to disclose evidence favorable to the accused. *United States v.*

*Agurs,* 427 U.S. 97, 103–07 (1976). "'[T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *United States v. Presser,* 844 F.2d 1275, 1281 (6th Cir.1988) (quoting *Agurs, supra,* 427 U.S. at 108). "'Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39 (1987)). This rule is applicable to impeachment evidence. *United States v. Bagley,* 473 U.S. 667, 677 (1985).

Several months prior to trial, Minsky requested information related to conversations and dealings Brown and West had with the government. The court ordered the production of all *Brady* material "in time for effective use at trial." The government, however, failed to disclose the statements that Brown made regarding his conversation with Healy. The government did not even provide the defense with a copy of Brown's polygraph test until the second day of the trial. Moreover, the government never provided the defense with copies of the FBI 302s. The defense therefore could not understand the significance of the polygraph results since the defense had no way of knowing that Brown claimed to have told Healy of the alleged scheme and that Healy had denied the conversation. *United States v. Salerno,* 937 F.2d 797, 807 (2d Cir.1991), *cert. granted,* 112 S.Ct. 931 (1992) ("To say that the government satisfied its obligation under *Brady* by informing the defendants of the existence of favorable evidence, while simultaneously ensuring that the defendants could neither obtain nor use the evidence, would be nothing more than a semantic somersault."). Disclosure of Brown's statements would have helped the defense to undermine Brown's testimony in which he never referred to Healy. Had the jury learned of Brown's false statements to the FBI, it might have disbelieved his entire testimony.

We hold that the government denied appellant the opportunity for a fair trial by improperly withholding information important to the defense.

### IV.

This brings us to the claim that the court improperly denied appellant access to the FBI 302s in violation of the Jencks Act. Review of the court's ruling is under the clearly erroneous standard; if the ruling was clearly erroneous, we must determine whether the resulting error was harmless. *United States v. Nathan,* 816 F.2d 230, 237–38 (6th Cir.1987).

The Jencks Act requires the production of any statements by a witness who has testified on direct examination for the prosecution. The Act defines these statements as, *inter alia,* "(1) a written statement made by said witness and signed or otherwise adopted by him [and] (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a *substantially verbatim* recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement...." 18 U.S.C. § 3500(e)(1) (emphasis added).

One purpose of the Jencks Act is to prevent "the undiscriminating production of agent[s'] summaries of interviews regardless of their character or completeness." *Palermo v. United States,* 360 U.S. 343, 350 (1959); *see also Nathan, supra,* 816 F.2d at 237; *United States v. Padin,* 787 F.2d 1071, 1077–78 (6th Cir.), *cert. denied,* 479 U.S. 823 (1986) (refusing to require production of DEA agents' debriefing report summarizing a witness interview because only parts were recorded and the witness never adopted the report); *United States v. Chitwood,* 457 F.2d 676 (6th Cir.), *cert. denied,* 409 U.S. 858 (1972). This is not to say, however, that an FBI agent's "rough notes" may never constitute a simultaneous verbatim statement which, under the Jencks Act § 3500(e)(2), is producible without any showing of adoption by

the witness. *United States v. Rewald*, 889 F.2d 836, 867 (9th Cir.1989).

Since the FBI 302s were not adopted by Brown or West, the only issue is whether the court erred in failing to order the production of the reports as "contemporaneous" and "substantially verbatim" statements. The mere fact that the court characterized Brown's testimony at trial as "substantially identical" to his FBI 302s does not mean that it was also a "substantially verbatim recital" of his oral statement given to FBI agents.

The essential difficulty that the court got itself into was delaying its *in camera* review of the FBI 302s until the trial was well under way and then doing so on the bench in the presence of government counsel but in the absence of the defendant and his counsel—all as discussed above in more detail.

■ While technically the government may withhold Jencks Act material until the conclusion of the direct examination of the witness, the better practice—and that followed in most federal courts today—is for the government to produce such material well in advance of trial so that defense counsel may have an adequate opportunity to examine that which is not in dispute and the court may examine the rest *in camera*, usually in chambers. This avoids the inevitable delay of the trial when the material is withheld until the witness concludes his direct examination. When we made this suggestion to government counsel at the argument of the instant appeal, he informed us that the suggested practice is now followed in his district. That should make the retrial of this case easier and more efficient. And *see United States v. McKeever*, 271 F.2d 669, 673–75 (2d Cir. 1959) (especially the proper use of a *voir dire* examination to resolve close questions regarding Jencks Act material; the distinction between a "substantially verbatim" and a "precisely verbatim" recital of a witness' pre-trial oral statement; and the recording of such statement "need be only contemporaneously, not simultaneously made").

V.

To summarize:

We reverse Minsky's conviction and order that he be granted a new trial. The *ex parte* bench conference clearly deprived him of a fair trial and was a Sixth Amendment violation. He also established a valid claim under *Brady*. While his Jencks Act claim is a close one, standing alone it would not warrant reversal.

*Reversed and remanded for a new trial.*