RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0076p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

IN RE: KING'S DAUGHTERS HEALTH SYSTEM, INC., a
corporation dba King's Daughters Medical Center,

> No. 22-5071

                     *Petitioner*.

─────────────────

On Petition for Writ of Mandamus.
United States District Court for the Eastern District of Kentucky at Ashland;
No. 0:15-cr-00015-1—David L. Bunning, District Judge.

Decided and Filed:  April 15, 2022

Before:  BATCHELDER, McKEAGUE, and GRIFFIN, Circuit Judges.

─────────────────

**COUNSEL**

**ON PETITION FOR WRIT OF MANDAMUS:** Ashley M. Ward, STITES & HARBISON, PLLC, Lexington, Kentucky, Michael D. Risley, STITES & HARBISON, PLLC, Louisville, Kentucky, for Petitioner.

─────────────────

**ORDER**

─────────────────

King's Daughters Health System, Inc., doing business as King's Daughters Medical Center ("KDMC"), petitions for a writ of mandamus, asking that we compel the district court to vacate its order granting a motion to compel and, further, that we compel the court to deny the motion to compel.  For the following reasons, we deny KDMC's petition for a writ of mandamus.

I.

This petition for a writ of mandamus is another chapter in the federal government's prosecution of Dr. Richard Paulus for healthcare fraud.  We have recounted the background of

this case in three opinions.  *See United States v. Paulus*, 894 F.3d 267 (6th Cir. 2018) (*Paulus I*); *United States v. Paulus*, 952 F.3d 717 (6th Cir. 2020) (*Paulus II*); *United States v. Paulus*, No. 20-6017, 2021 WL 3620445 (6th Cir. Aug. 16, 2021) (*Paulus III*).

Our opinion in *Paulus II* recounts the background relevant to this mandamus petition:

## A.

For years Paulus was a successful cardiologist at King's Daughters Medical Center (KDMC).  He performed an incredible number of angiograms and was "first in the nation for the total amount billed to Medicare for these procedures."  But not all was well. Complaints emerged that Paulus was performing medically unnecessary procedures. And several audits indicated that in multiple cases Paulus had reported a higher degree of blockage in his patients' arteries than their angiograms reflected.  Meaning, in some cases, the patient's angiogram showed a low degree of blockage and thus that the patient didn't need a stent inserted. Yet Paulus reported a much more severe blockage, inserted a stent, and then billed patients and their insurance companies for the stent procedure.

Eventually, these allegations reached the federal government.  At first, the government considered entering into a civil settlement with Paulus. In a letter setting forth its demands, the government stated that its consultants had reviewed 496 of Paulus's procedures and concluded that 146 of them (or about 30%) were unnecessary because the patients' angiograms showed minimal arterial blockage. The government further noted that its experts weren't the only ones who found Paulus's procedures to be problematic: the letter explained that KDMC's "consultants [had] also reviewed a random selection of Dr. Paulus' procedures, and found 75 angiographic films with [minimal blockage] in the artery he stented."  But after some back-and-forth, the attempts at a civil settlement fell through, and the government obtained an indictment.

## B.

At trial the government called three expert witnesses, Drs. Ragosta, Morrison, and Moliterno, who showed angiograms from 72 different patient files to the jury.  While displaying each angiogram, the doctors diagnosed the amount of blockage in the patient's artery and contrasted their diagnosis with that stated in Paulus's report.  Based on the differences between what the government's experts saw in the angiograms and what Paulus reported, the experts concluded that Paulus overstated his patients' arterial blockage and inserted medically unnecessary stents.  They also emphasized that this was not "an isolated case[.]" Instead, Ragosta presented evidence of overstatements in 62 out of the 250–300 cases he reviewed, and he called the 62 cases a "representative sample"; Morrison

noted that over half of the 11 randomly selected procedures he reviewed were unnecessary; and Moliterno asserted that all of the stent procedures he reviewed were unnecessary. Based on this testimony, the government argued that Paulus "saw one thing on the angiogram and consciously wrote down another." And he didn't just do it occasionally. According to the government's closing argument, Paulus did it "frequently, repetitive[ly], daily."

After 23 days of trial, four days of jury deliberations, one judicial pep talk, and one *Allen* charge, the jury convicted Paulus of one count of healthcare fraud and ten counts of making false statements relating to healthcare. But the case didn't proceed to sentencing. The district court vacated the convictions, finding that there was insufficient evidence both that Paulus made false statements and that he had fraudulent intent. But that didn't stand. We disagreed with the district court's reasoning and reversed its order.

C.

The plot twisted once more. After remand and before sentencing, the government disclosed to Paulus for the first time the "Shields Letter." According to the letter, when KDMC was facing its own legal trouble, it hired a team of independent experts to review Paulus's work ("KDMC Review"). KDMC's consultants reviewed 1,049 of Paulus's cases and flagged 75 of his procedures as unnecessary. In the Shields Letter, KDMC's attorneys explained to the government their consultants' findings and offered to refund Medicare for the payments the hospital had collected for the 75 flagged procedures.

While Paulus already knew that KDMC had identified 75 of his procedures as problematic, he did not know that KDMC consultants had reviewed 974 other procedures that they apparently found non-problematic. The defense viewed this evidence as exculpatory because it meant that the KDMC Review found that the rate of unnecessary surgeries, 75 out of 1,049, or about 7%, was far lower than what the government experts had testified at trial; this lower percentage was less consistent with systemic and purposeful fraud and more consistent with occasional mistakes or diagnostic differences of opinion between cardiologists. Seeking more information, Paulus moved to compel the government to produce all information related to the letter.

It was only then that the defense got the full picture. The government disclosed to Paulus a series of events that had taken place before his trial. Long before Paulus was indicted, KDMC sent the government the Shields Letter. And when the government later elected to charge Paulus, it planned to use the Shields Letter in its case-in-chief and to disclose the letter to Paulus. But KDMC objected, arguing that the letter was both privileged and inadmissible. So, about a month before trial, the government brought the dispute to the district court, and the court scheduled an ex parte hearing, so as to protect KDMC's asserted privilege.

But even though privilege was ostensibly the reason for holding the hearing ex parte, the district court made no decision regarding the privilege issue. The court opened the hearing by saying it would put privilege aside and decide instead whether the information was inadmissible under Federal Rule of Evidence 408. The government argued that the letter was admissible. And to its credit, the government also argued that even if the letter wasn't admissible, the government was obligated to disclose it to Paulus under *Brady*. Although the government wished to introduce evidence of the KDMC Review at trial for its inculpatory value, it also recognized that the review had exculpatory value to Paulus. But the district court was unconvinced. It held that the information was inadmissible—a ruling that both parties now agree was wrong—and that the government wasn't obligated to turn it over to Paulus. And even though it made no ruling on privilege, the district court concluded the hearing by inexplicably ordering that the parties "[we]re not to disclose" any more information about the KDMC Review to Paulus.

Having discovered this information after his trial, conviction, and remand from this court, Paulus moved for a new trial. The district court rejected Paulus's arguments and proceeded to sentencing.

*Paulus II*, 952 F.3d at 720–22 (internal citations omitted).

On appeal, we vacated Paulus's convictions and remanded for a new trial on grounds that the Shields Letter was material to Paulus's defense and that the government's failure to disclose the letter therefore violated Paulus's Fifth Amendment due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at 728.

KDMC's counsel, William Shields, sent the Shields Letter in 2013 during settlement negotiations with the government regarding the hospital's potential violations of the False Claims Act and Stark Law. The letter disclosed to the government only that KDMC's experts reviewed a random sample of 1049 stent procedures performed by Paulus and that its experts preliminarily assessed that in "75 of those 1049 procedures the percentage of occlusion"—or blockage—"was 30% or less." The letter also disclosed the names of those 75 patients. Important here, Shields wrote: "As A.U.S.A. Andrew Sparks and I have agreed, the disclosure of this information does not waive any attorney-client privilege or attorney work product protection." KDMC does not contend that a written agreement exists. The government maintains that it did not reach an oral or written agreement regarding KDMC's waiver of privileges by disclosing information about the study in the Shields Letter.

On remand after *Paulus II*, in preparation for Paulus's re-trial, the government subpoenaed KDMC for the following additional information regarding the study referenced in the Shields Letter:

- Documents identifying the 1,049 procedures reviewed, with patient name and date of procedure;

- All opinions or conclusions reached by the experts regarding the percentage of occlusion in the stented arteries;

- All opinions or conclusions reached by the experts regarding the medical necessity of the procedures;

- All records describing or identifying the sampling methodology and the manner in which the medical review was conducted;

- All records identifying the independent experts and the procedures each of them reviewed; and

- All correspondence between KDMC and Dr. Paulus regarding the medical review.

KDMC objected to the subpoena on grounds that the requested information was protected by the attorney-client, work-product, and settlement privileges. The government then filed a motion to compel, which KDMC opposed on privilege grounds.

The Magistrate Judge rejected KDMC's privilege arguments and granted the government's motion to compel. KDMC objected to the Magistrate Judge's order. Following a hearing, the district court overruled KDMC's objections and adopted the Magistrate Judge's opinion and order.

Ironically, Paulus also opposed the government's motion to compel. This despite having obtained vacatur of his convictions in *Paulus II* based on his argument that government violated *Brady* because the information it had about the KDMC study was exculpatory and Paulus therefore should have been able to use the letter in his defense. 952 F.3d at 722, 724–28.

KDMC now seeks a writ of mandamus from this court compelling the district court to vacate its order granting the motion to compel and to deny the motion to compel on privilege grounds.

II.

Mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367, 380 (2004) (internal quotation marks and citation omitted). Because the writ of mandamus "is one of the most potent weapons in the judicial arsenal, three conditions must be satisfied before it may issue." *Id.* (internal quotation marks and citations omitted). First, a petitioner must "have no other adequate means to attain the relief [it] desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Id.* at 380−81 (citation omitted). Second, a petitioner must show a "clear and indisputable" right to the relief sought. *Id.* at 381 (citation omitted). Finally, a petitioner must show that issuing the writ is otherwise "appropriate under the circumstances." *Id.*; *see also In re Pros. Direct Ins. Co.*, 578 F.3d 432, 437 (6th Cir. 2009) (listing five balancing factors to consider when deciding whether to issue the writ).

**A. No other adequate means**

KDMC has satisfied the first requirement. It has no other adequate means to obtain review of the district court's order compelling disclosure of its purportedly privileged information. To start, KDMC does not have recourse in a typical postjudgment appeal. "[D]iscovery orders generally are not final decisions" and therefore ordinarily cannot be appealed until "the trial court enters a final judgment[.]" *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 444 F.3d 462, 471 (6th Cir. 2006). That remains true even in the context of compelled disclosure of attorney-client privileged information: the Supreme Court has determined that "postjudgment appeals generally suffice to protect the rights of litigants and ensure the vitality of the attorney-client privilege." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 109, 114 (2009). However, *Mohawk* only applies "where the privilege holder is a party to the litigation with recourse in a post-judgment appeal." *Holt-Orsted v. City of Dickson*, 641 F.3d 230, 238 (6th Cir. 2011). Here, KDMC is not a party to the government's prosecution of Paulus. Thus, it would not have recourse in a postjudgment appeal.

KDMC also lacks recourse under the collateral order doctrine. The collateral order doctrine permits us to review a "small class of collateral rulings that do not end the litigation but

are appropriately deemed 'final.'" *Ohio A. Philip Randolph Inst. v. Larose*, 761 F. App'x 506, 510 (6th Cir. 2019) (quoting *Mohawk*, 558 U.S. at 105 (cleaned up)). We have "repeatedly held" that "discovery orders are generally not appealable under the collateral order doctrine." *Pogue*, 444 F.3d at 472.[1]

That leaves one other potential path to appellate review: KDMC could defy the district court's order, be held in contempt, and appeal the contempt order. *Pogue*, 444 F.3d at 474 ("a nonparty can immediately appeal an adjudication of either civil or criminal contempt"); *United States v. Johnson*, 736 F.2d 358, 359 n.1 (6th Cir. 1984) ("A judgment of civil contempt entered against a nonparty is appealable as a final judgment.").

It remains the "general rule" in this circuit that a non-party "seeking to appeal a discovery order must first disobey the order and suffer a contempt citation[.]" *Pogue*, 444 F.3d at 471 (citing *Alexander v. United States*, 201 U.S. 117, 121–22 (1906)); *see also Ohio A. Philip Randolph Inst.*, 761 F. App'x at 512 (holding that mandamus was inappropriate "because the RNC, NRCC, and Kincaid are nonparties to the action, [so] they can withhold the requested documents and immediately seek review of the contempt sanction"). But, in some cases, we have found mandamus appropriate for reviewing discovery orders related to attorney-client privilege that were not otherwise reviewable until final judgment. *See In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 n.3 (6th Cir. 2006); *In re Lott*, 424 F.3d 446, 449−50 (6th Cir. 2005); *In re Perrigo Co.*, 128 F.3d 430, 437 (6th Cir. 1997). Thus, we have recognized that the general rule can be overcome if the mandamus petition presents "some substantial or novel issue requiring immediate review[.]" *Pogue*, 444 F.3d at 473 n. 6 (describing *In re Lott* and *In re Perrigo Co.*).

---

[1]One exception, known as the *Perlman* rule, permits the holder of a privilege who is not a party to the litigation to immediately appeal a discovery order directed "to a disinterested nonparty who will not risk contempt merely to protect" the privilege. *Pogue*, 444 F.3d at 474 n.8 (citing *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 18 n.11 (1992)). The *Perlman* rule does not apply here. It is true that KDMC is not a party to the Paulus criminal case, but the "*Perlman* exception is relevant only to appeals brought by the holder of a privilege where the disputed subpoena is directed at *someone else*." *Holt-Orsted*, 641 F.3d at 237 (quoting parenthetically *In re Air Crash at Belle Harbor, New York on November 12, 2001*, 490 F.3d 99, 106 (2d Cir. 2007)). Here, the subpoena is directed at KDMC seeking KDMC's privileged information.

This mandamus petition presents novel issues, explored in detail below.  It also comes to us in a novel circumstance: it arises from a discovery order directed to a non-party in a criminal prosecution (unlike the civil cases cited above).  Furthermore, given the interests at stake in criminal cases, we are reluctant to say that contempt constitutes "other adequate means" for a non-party to seek review of an order compelling disclosure of attorney-client privileged information to the government.  *Cheney*, 542 U.S. at 380.  In the end, though, even if KDMC has shown that mandamus is an appropriate vehicle for obtaining review of the district court's order, KDMC has not shown that it is entitled to relief on the merits.  *See, e.g.*, *In re Powerhouse Licensing, LLC*, 441 F.3d at 473 n.3 (recognizing "that the scope of the attorney-client privilege implicates the kind of important interests that would normally favor mandamus" but denying petition because district court's order was not clearly erroneous).

**B.  Clear and indisputable right to relief**

To obtain mandamus relief, KDMC must show that its right to relief is "clear and indisputable."  *Cheney*, 542 U.S. at 381 (citation omitted).  Below, the government conceded that the materials sought by its subpoena would be protected by the attorney-client privilege but for waiver.  Therefore, the issue here is whether, and to what extent, KDMC waived its attorney-client privilege over material related to its experts' study of Paulus's procedures by disclosing selective information about the study to the government in the Shields Letter.

Ordinarily, the voluntary disclosure of attorney-client privileged communications to a third party waives the privilege as to those communications.  *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999).  And "[w]hen the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding" when "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together."  Fed. R. Evid. 502(a)(1)–(3).  Parties may contract as to the "effect of disclosure in a federal proceeding"—but that agreement "is binding only on the parties to the agreement, unless it is incorporated into a court order."  Fed. R. Evid. 502(e).

The district court found that KDMC's partial disclosure of its experts' findings in the Shields Letter waived KDMC's privilege as to all the information related to the experts' review of Paulus's procedures. It also reasoned that Rule 502(e) did not apply because KDMC did not produce sufficient evidence to establish that it had an agreement with the government limiting the effect of its initial disclosure of the Shields Letter.[2]

We agree with the district court that KDMC's disclosure of some information regarding its experts' study waived its privilege over the related, undisclosed information now sought by the government. KDMC's disclosure of the information in the Shields Letter was "intentional[.]" Fed. R. Evid. 502(a)(1). The undisclosed information now sought by the government, such as information for all 1049 procedures reviewed by KDMC's experts and the methodology used by the experts, "concern[s] the same subject matter" as the information disclosed in the letter. Fed. R. Evid. 502(a)(2). And there can be little doubt that the information disclosed in the Shields Letter "ought in fairness to be considered together" with the undisclosed information regarding the study. Fed. R. Evid. 502(a)(3).

Indeed, in this case, Paulus's Fifth Amendment due process rights are in play. In *Paulus II*, we reversed Paulus's convictions on grounds that the information about KDMC's expert study contained in the Shields Letter was material and exculpatory, and therefore, the government's failure to disclose the letter to Paulus violated *Brady*. 952 F.3d at 728. We reasoned that "the study tends to refute"—or at least, the information about the study contained in the Shields Letter tends to refute—"the government's evidence that Paulus systematically misdiagnosed the

---

[2]The district court also relied on this court's opinion in *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289 (6th Cir. 2002). *Columbia/HCA* is inapposite here. In that case, private plaintiffs filed suit against a healthcare company related to its Medicaid and Medicare billing practices. *Id.* at 292. Prior to that suit, the government had settled with the company after opening a fraud investigation into those same billing practices. *Id.* The plaintiffs sought disclosure of internal audits the company had disclosed to the government during that fraud investigation. *Id.* at 293. The company opposed disclosure, asserting the theory of selective waiver. *Id.* It argued that it could disclose privileged material to the government while still maintaining its privilege over that material as to other parties. *Id.* This court rejected the company's argument and the theory of selective waiver in its entirety: Once a party discloses privileged communications to one party, even the government, it does not retain the privilege over those communications as to other parties. *Id.* at 302–04.

This case is different from *Columbia/HCA* because it involves a waiver dispute between the same parties privy to the initial disclosure. In other words, KDMC initially disclosed privileged material to the government; now, the government—the same party—seeks disclosure of additional undisclosed privileged material from KDMC based on KDMC's initial disclosure. *Columbia/HCA* concerned whether disclosure of privileged material to the government waived privilege over that same material as to other parties.

amount of blockage in his patients' arteries." *Id.* at 726. We also reasoned that Paulus "could have used the Shields Letter to impeach the government's witnesses by calling into question how representative their samples were." *Id.* at 727. But, as the district court found, the Shields Letter disclosed selective information about only a small portion of the data collected and analyzed by KDMC's experts.

Of course, *Brady* does not impose an obligation on private non-parties to disclose privileged information to the government that might exculpate a criminal defendant. But we do not think that KDMC, having selectively disclosed privileged information to the government about its experts' study in an effort to settle potential claims against it, can maintain its privilege over the undisclosed information necessary to understand the study that we have found to be material to Paulus's criminal defense. On the flip side, if the full scope of information about the study would not be exculpatory (as the government argued in *Paulus II*), Paulus is not entitled to admit the selective information disclosed in the Shields Letter to paint an inaccurate picture of that evidence to the jury. Were that the case, this situation is precisely the one for which Rule 502(a) was designed: where "fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502(a) advisory committee notes. Either way, KDMC's privilege over the undisclosed information about the study must give way to allow for a "complete and accurate presentation" of the study in Paulus's criminal trial. *Id.*

Finally, we see no clear error in the district court's finding that KDMC failed to establish the existence of an agreement with the government limiting the scope of the waiver effectuated by the Shields Letter. *See* Fed. R. Evid. 502(e). KDMC and the government presented conflicting testimony on whether KDMC's counsel reached a contemporaneous oral agreement with the government limiting its privilege waiver when sending the Shields Letter to the government. But KDMC has never produced a written agreement. Given the conflicting testimony and the absence of written agreement, we cannot say that the district court's finding was clearly erroneous. *See In re Powerhouse Licensing, LLC*, 441 F.3d at 473. And ultimately, even if KDMC and the government had reached the purported oral agreement, we are skeptical

that the agreement would be enforceable under Rule 502(e) given Rule 502(a) and the government's *Brady* obligations.

In sum, the district court did not err in granting the government's motion to compel. KDMC is not clearly entitled to relief on the merits of its privilege claim. *Cheney*, 542 U.S. at 380. And because KDMC is not clearly entitled to relief, we need not consider whether mandamus is otherwise appropriate under the circumstances. *See id.*

The petition for a writ of mandamus is **DENIED**.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk